## HAPPY VALLEY HOMES, INC., v. AMERICAN GLANZSTOFF CORPORATION.

Eastern Section.    November 6, 1931.

Petition for Certiorari denied by Supreme Court, February 13, 1932.

Sells, Simmonds & Bowman, of Johnson City, for complainant.

Cox, Taylor & Epps, of Johnson City, Dugger & Reese, of Elizabethton, for defendants.

SNODGRASS, J. After various and substantial inducement, the American Glanzstoff Corporation, under the auspices of the Chambers of Commerce of Johnson City and Elizabethton, Tennessee, located a plant in Elizabethton, with a promise of an expenditure of $5,000,-000. and the employment of thousands of operatives. A contract evidencing this general statement is filed in the record, and among the provisions thereof was featured the building of a large number of houses to supply residences for those operatives, as it was a matter of necessity to thus facilitate the vicinity of this plant for its successful operation, so that, among others, complainants were moved to construct twelve of these houses under a contract dated the 25th day of February, 1928, as follows:

"This agreement made and entered into on February 25, 1928, between the Happy Valley Homes, Incorporated, a Tennessee Corporation, with offices at Johnson City, Tennessee, party of the first part and the American Glanzstoff Corporation, a Delaware Corporation, party of the second part.

"Whereas, for the mutual advantage of both parties hereto it is agreed that the party of the first part shall immediately proceed with the construction of twelve (12) houses, and to have said houses ready for occupancy by July 1, 1928, said houses to be constructed on the property to be designated by the party of the second part on the lands now owned by the Watauga Development Corporation, by purchasing the lots so designated at such prices and terms as may be agreed upon by the party of the first part and the Watauga Development Corporation. Detailed plans and specifications covering such houses are to be prepared by the party of the first part, and to be approved by the party of the second part, and are to conform in

508

principle to the preliminary sketches submitted with bids on the various type houses agreed upon, which are as follows:

| | | | | |
|---|---|---|---|---|
| "2 Houses like Type 4—A @ | $2022 | | | $4044 |
| "2 Houses like Type 4—B @ | 1944 | | | 3888 |
| "2 Houses like Type 5—A @ | 2684 | | | 5368 |
| "2 Houses like Type 5—B @ | 2738 | | | 5476 |
| "2 Houses like Type 6—A @ | 3056 | | | 6112 |
| "2 Houses like Type 6—B @ | 3036 | | | 6072 |
| "Total for the 12 houses | | | | $31560 |

"The party of the second part undertakes to collect the rent on such houses built under this agreement as have been rented to employees of the Corporation. It furthermore assumes liability for the payment of the rent on the first twelve (12) houses for a period of ten years or until otherwise disposed of. This rent to be payable in equal monthly payments and not to exceed annually a total of thirteen per cent on the net cost of said houses, including land and utilities assessed against the property, if any, which total percentage provides three per cent for taxes, insurance and repairs.

"The party of the second part has the first call for these houses at the terms set forth in these agreements. The party of the first part will give the party of the second part thirty (30) days written notice within which the party of the second part can exercise th's privilege. If it should fail to do so, these houses cease to be subject to the terms of these agreements, the party of the first part being at liberty to rent or sell as it may see fit.

"The party of the second part retains the right to purchase or to claim for sale all of said homes which have not been, meanwhile, sold or rented to other parties, at such prices as covers the original cost of said houses plus ten per cent per annum on the original purchase price of the lot only.

"It is further agreed by the party of the first part and party of the second part, and for the mutual benefit of the parties hereto that should the party of the second part be unable to induce these employees to occupy these houses on a rental basis above referred to, due to the method of construction or type of houses built under this system after due diligence with their employees, it is mutually agreed that the party of the second part will be relieved of its obligation under this contract to guarantee the rent of same and their interests in this contract will be released and their rights assigned to the party of the first part.

"It is further agreed that the party of the first part will either furnish to the party of the second part an indemnifying bond or personal bond to be signed by the stockholders of the Happy Valley Homes, Incorporated, to the amount of $15,000 for the faithful performance of the content incorporated in their agreement.

"In witness whereof, the parties hereto have executed this agreement as of the day and year first above written.
"Happy Valley Homes, Inc.,
"By M. E. Williams, President.
"American Glanzstoff Corporation,
"By Dr. A. Mothwurf, President."

On July 10, 1928, an addenda was made to the contract as follows:
"This statement becomes an addition to the contract dated February 25, 1928, executed by Happy Valley Homes, Incorporated, of the one part, and the American Glanzstoff Corporation, of the other part, witnesseth:

"The Watauga Development Company will immediately deed to Happy Valley Homes, Incorporated, lots eight (8) and nine (9) in Block A; lots one (1), two (2), three (3), four (4), five (5), six (6), seven (7) and eight (8) in Block B and lots ten (10) and eleven (11) in Block C as per map or plat of that addition on record in the Register's office in Elizabethton, Tennessee, in Plat Book 1, page 81, and the houses described in original contract are located on the lots above described, and this additional contract is merely made for the purpose of identifying the real estate on which the houses are located.

"Executed in duplicate on this July 10, 1928.
"American Glanzstoff Corporation,
"By—Dr. A. Mothwurf, President.
"Happy Valley Homes, Incorporated.
"By M. E. Williams, President."

Then on September 11, 1928, the following letter was addressed to and received by the complainant from the American Glanzstoff Corporation:
"American Glanzstoff Corporation
"P. O. Box 8
"Elizabethton, Tennessee.
"Johnson City, Tennessee.
"September 11, 1928.
"Happy Valley Homes, Inc.,
"Johnson City, Tenn.

"Gentlemen: Final inspection was made this morning by Dr. G. N. Brekke and J. W. Ring, representing the American Glanzstoff Corporation, and M. E. Williams and Julius Switgall, representing the Happy Valley Homes, Incorporated, of the twelve (12) houses built under contract dated February 25th, 1928.

"We beg to advise that we accept the twelve (12) houses, acceptance to be effective as of September 15th, under the terms and conditions of the contract above referred to.
"Very truly yours,
"American Glanzstoff Corporation,
"J. W. Ring.
"G. N. Brekke.

510

"Approved:
 "Dr. A. Mothwurf, President.
"JWR:MP"

From this time the defendant, which will be called the corporation when essential to so designate it, took rental charge of these houses and paid, as upon a guaranty, the thirteen per cent monthly upon the estimated cost appearing in the contract, though it fell short of the real cost of such erection, the corporation insisting that such cost was the only basis it was obligated to recognize as a determinate of its liability, which was acquiesced in by complainant. However, certain additions were afterwards made which it was agreed augmented the costs, and the liability was thereafter calculated upon such increase and paid until October 1, 1929, when the contract was canceled by the defendant corporation through a notification by letter of August 31, 1929, as follows:

"American Glanzstoff Corporation
"P. O. Box 8
"Elizabethton, Tennessee.

"August 31, 1929.                                    Registered
"Happy Valley Homes, Inc.,
 "Johnson City, Tennessee.
"Attention: Mr. Folsom B. Taylor, Secretary & Treasurer.
           "In re: Contract for Houses.

"Gentlemen: Under the terms of contract executed on February 25th, 1928, between your company and ourselves regarding the guarantee of certain rentals based upon a thirteen per cent on the net cost of said houses, we had the option of terminating this contract if we were unable to induce our employees to occupy the same upon said rental basis. We are basing this right upon the following clause in said contract:

" 'It is further agreed by the party of the first part and party of the second part, and for the mutual benefit of both parties hereto that should the party of the second part be unable to induce their employees to occupy these houses on a rental basis above referred to, due to the method of construction or type of said houses built under this system after due diligence with their employees, it is mutually agreed that the party of the second part will be relieved of its obligation under this contract to guarantee the rent of same and their interests in this contract will be released and their rights assigned to the party of the first part.'

"For the past several months our housing department has been very diligent in endeavoring to rent these houses upon the same basis that we guaranteed the rent to you, but has found it impossible. As a result of our inability to rent said houses on basis above referred to, this company has suffered a considerable loss. We are, therefore, compelled to take advantage of our rights given us under our con-

tract and treat the same as released and assigned to you as of the date of October 1, 1929.

"The purpose of this letter is to give you due notice of our intentions and of the date that we shall treat this contract at an end.

"Rents will be adjusted up to and including the month of September. You will be at liberty to make any arrangments you may desire with tenants after receipt of this letter for rents accruing after September 30th, 1929.

"[Signed]          W. G. Kummer,
"President, Pro-Tem."

Regarding the increases that were recognized as legitimate alterations in the basis of liability, we insert certain correspondence regarding landscaping.

One is a letter from defendant to complainant of date of March 23, 1929, as follows:

"Happy Valley Homes, Inc.
    "Johnson City, Tennessee.
      "Attention Mr. Julius Switgall.

"Gentlemen: Dr. Mothwurf wants the Happy Valley Homes houses landscaped at an early date and he has instructed me to go ahead and do the work.

"I have given you a very low figure of $25 per house, making a sum total of $300 and I presume that it is his intention that you may add that amount to your total cost of houses.

                "Yours very truly,
"GAS/TS           American Glanzstoff Corporation,
          "By Geo. A. Schmitt, Rental Agent.
"CC to: Dr. Mothwurf,
    "Mr. J. W. Ring."

The reply of complainant to this letter was as follows:

"American Glanzstoff Corporation,
    "Elizabethton, Tennessee.
      "Attention Mr. J. W. Ring, Housing Department.

"Re: Landscaping of 12 houses of the Happy Valley Homes, Inc.

"Gentlemen: Dr. Mothwurf is desirous that Landscaping be done on our 12 houses without delay.

"We have received a proposition from Mr. Geo. A. Schmidt that he will landscape the houses herein mentioned at the price of $25 per house, a total of $300. It is understanding that the $300 so spent will be added to the cost of the houses, and will bear the usual 13% interest, for the remainder of the lease with your company, and which will be paid in monthly installments. Kindly authorize this at once so the work of landscaping may commence immediately.

                "Yours very truly,
              "Happy Valley Homes, Inc.,
"JS/R              By —————, Secretary."

We insert another letter of May 29, 1929, regarding screening, as follows:

"Happy Valley Homes, Inc.,
   "Johnson City, Tennessee.
                 "Attention: Mr. Julius Switgall.

"Gentlemen: This will acknowledge receipt of your letter of the 23rd in which you submit bid of $900 or $75 for completely screening windows, doors and all outlets of the twelve houses that our company has under rental agreement with you.

"The price quoted is satisfactory and you can proceed immediately to install these screens and when they are completed you can add the amount to the original cost which we will agree to pay you on the same terms and conditions as the houses.

                              "Very truly yours,
                    "American-Bemberg, Glanzstoff Corp.
                                "Housing Department.
"JWR/G                                     By J. W. Ring."

Any further statement of the facts essential to a complete understanding of the issues will be found in the chancellor's opinion embodied in his decree, which is as follows:

"Pursuant to order heretofore entered in this cause, providing that the cause might be heard and determined in vacation as if in term time, this cause came on to be heard on this the 10th day of February, 1931, on the bill, amended and supplemental bill, and answer and the cross-bill and answer thereto, the pleadings, depositions, exhibits and proof on file, and the record at large, and the Court having read the pleadings and heard the depositions, exhibits, proof and the record at large read, and having heard arguments of counsel for the parties to the cause in open court, and having carefully considered the same, on this the 20th day of February, 1931, the Court doth find, order and decree as follows:

"I. The Court is of opinion and doth find that the contract between the complainant and the defendant in controversy in this cause, when properly construed in the light of the surroundings and circumstances of the parties at the time of its execution, and in the light of the conduct of the parties and construction placed thereon by them, is a contract by which the defendant bound itself to pay to the complainant for a period of ten years, subject to a cancellation clause hereinafter referred to, a rental upon the houses in question of 13% annually, payable in equal monthly installments. This indeed may be fairly gathered from the contract itself and the Court holds that said contract is binding on the parties and enforceable up to the date of the amended and supplemental bill. The contract provides that the defendant guarantees the rental for a period of ten years not exceeding 13%, to be remitted in equal monthly installments, and then by another clause provided for its cancellation

if the defendant should be unable to induce its employees to rent the houses at said rate due to the method of construction and to the type of the houses; further, the contract shows evidence of careful attention to the matter of costs, the costs of the houses forming the basis of the rental appearing on the face of the contract, and by an addendum to the contract the costs of the land having been carefully provided for, and by subsequent letters and agreements, certain additional costs having been agreed upon, all of which evidences the intention and purpose of the parties to provide for the payment of a fixed rental upon a fixed cost. However, if there be any doubt about this from the terms of the contract itself, it clearly appears that the parties themselves have construed the contract as above. The defendant upon completion and acceptance of the houses paid rental upon the basis of 13% of the costs, regardless of occupancy of the houses or rentals collected therefrom until the time of the attempted cancellation. There appears in the record a letter from J. W. Ring, a representative of the defendant, under date of May 29th, wherein certain additional expenses and costs were agreed upon, and wherein it is stated that upon the completions of the improvements therein agreed upon "you can add the amount to the original cost which we will agree to pay you on the same terms and conditions as the houses." Again in the letter from Mr. Kummer of August 31st, attempting a cancellation of the contract, it appears that their desire to cancel was more particularly because of their inability to rent the houses at 13% or rather so as to net 13% to the owners, thus recognizing the liability of defendant to pay upon the basis of 13% of the cost. From all the foregoing and other reasons the Court is of opinion and holds that the contract is one for the payment of 13%, a definite rental upon a definite agreed cost.

"II. With reference to the question raised on the letters passing between the parties of August 31st, September 7th, September 26th and October 3rd, the defendants contend that this correspondence shows agreement or consent by the complainant to a cancellation of the contract. The Court is of opinion and holds that from said correspondence and the proof, this contention is not sustained and that when viewed in the light of the surroundings of the parties, their actions, correspondence and conferences, there does not appear any intention upon the part of the complainant to consent to a cancellation of the contract and to waive its rights thereunder, but on the contrary, that the arrangement was a mere temporary expediency to save loss to the parties, and to avoid immediate litigation and receivership. The complainant contends and its contention is supported by the depositions of Mr. Switgall and Mr. Taylor, that it never at any time consented to a cancellation of the contract, but that the arrangement suggested was a mere temporary arrangement

514

until the Board of Directors of complainant could be gotten together to determine upon a course of action. The letter of defendant, by Mr. Brekke, under date of September 26th, refers to the fact that the Board of Directors of complainant would have to be consulted before determining upon a definite course of action, and thereafter, on October 3rd, the complainant, by its representative Julius Switgall, addressed a letter to the defendant, reciting that the Board of Directors had been consulted though they had not been convented in meeting on account of being scattered, and they did not or would not consent to any new contract, or waive any rights under the existing contract. The Court is of opinion that there was no laches or delay in communicating this fact to the defendant, and that the Court would not be justified in finding that the complainant waived any of its rights under the contract, and so holds and decrees.

"III. Coming now to the main question in the case, and the one around which most of the controversy has been waged, and a large part of the proof has been taken, that is, the question of the right of the defendant to cancel the contract under the clause of the contract reading as follows:

" 'It is further agreed by the party of the first part and party of the second part, and for the mutual benefit of both parties hereto that should the party of the second part be unable to induce these employees to occupy these houses on a rental basis above referred to, due to the method of construction or type of houses built, under this system after due diligence with their employees, it is mutually agreed that the party of the second part will be relieved of its obligation under this contract to guarantee the rent of same and their interests in this contract will be released, and their rights assigned to the party of the first part.'

"It appears that the type of houses was somewhat new in this section of the country and this clause was evidently inserted to guard against a contingency of inability to rent the houses on account of the method of construction or type of the houses, solely a contingency which could not be foreseen by the parties. Contracts are made to be performed and it was evidently the intention and purpose of the parties to this contract that the same should be performed unless its performance should be prevented solely on account of the possible unforeseen difficulties that might arise due to the method of construction or to the type of the houses. A great deal of proof has been taken on this question, the defendant resting his complaint largely on the fact of more or less dampness or moisture developing in windows and walls of some of the houses. It appears that the defendant undertook from the beginning, when it took the house over, to charge a rental thereon which would net it a profit over and above 13%, and this rate of rental was continued until some time in the summer of 1929. In the meantime a strike or

strikes had occurred at said plants and rentals in and about Eliza-bethton declined. It clearly appears that rental values went down. To meet these conditions, the defendant reduced rentals on these and other houses in which it was interested. To meet the situation just stated, the defendant reduced rentals on these and other houses in which it was interested. To meet the situation just stated, the defendant was forced to reduce rentals upon the houses in question and it appears from the record that when the rentals from these houses were brought in line with rentals from other houses, the difficulty of renting these houses was materially lessened, and there appears to have been occupancy of the same from that time on until about the time this suit was brought, certainly equal to and perhaps in excess of the other houses under the control of the defendant of different, and of the usual type of construction. Taken in its final analysis there is very little proof on behalf of the defendant as to the inability to rent the houses in question solely because of the method or type of construction, and due to the development of dampness or moisture; for practically all of its witnesses, and those who occupied the houses and found objections thereto, couple with their objections to the houses, the objection as to the amount of rentals, and in fact moved or vacated at least partly in order to obtain cheaper rental. One of the defendants' witnesses who testified that he moved out of the house on account of objections to the house and the high rental, it appears since the suit was started, moved back and is living in one of the houses, and this since the rentals of the houses had been reduced in line with other houses. It is true that some of the defendant's witnesses testified to certain dampness or moisture developing on the windows, and occasionally on the walls of the houses, the defendant having introduced some seven or eight witnesses who occupied the houses, but a close examination of their evidence shows that the complaints appear to be largely due to the condensation of moisture upon the windows and some other portions of the house. This is a condition which the Court believes may be found in most any house on a cold day when a fire is started and the interior of the house quickly heated, and there is a certain amount of condensation on the windows and sometimes on the doors and walls of the house. The Court himself lives in a frame house where this condition has been observed. It appears from the evidence of some of the witnesses that this condition is found to exist when washing or boiling of water is taking place in the house, which the Court finds from the record, and knows of his own experience, is not an unusual condition to be encountered in houses of ordinary type of construction in this section such as frame houses. The Court holds and the defendant has admitted, by its counsel in argument, that the burden of proof rests on the defendants to show that the failure to rent the houses

on the basis of the contract was due to the method of construction or to the type of house built. Taking the defendant's proof at its best, the Court is of opinion that the defendant has introduced some eight or ten witnesses on the question of objection to the houses, evidence of dampness, as aforesaid, etc., whereas the complainant has introduced some fifteen or twenty witnesses, five of whom had lived in the houses and found no objection thereto, and no evidences of dampness therein. Some of the defendant's witnesses testified about the clothes and shoes molding or mildewing, but complainant's witnesses who lived in the houses had no complaint to make of this and found no evidence of it. The Court knows from his own experience that clothes and shoes will, during a continued damp spell, and especially where the house and closets therein are closed to prevent the circulation of fresh air, show mildew or mold and that this will occur in frame houses. In addition to the five witnesses who had lived in houses and found them entirely satisfactory, the complainant introduced a great number of contractors, witnesses whose credibility is unquestioned, who had inspected the houses, during or immediately after rainy weather, and found no evidence of dampness or other objection due to method of construction or type of house.

"It appears that there were a great many vacancies among other houses belonging to or under the control of the defendant company of frame or brick type of construction, and the Court would not be justified in finding that such vacancies as may have existed in the houses in question were due to the type of houses or method of construction.

"From all of which the Court finds, holds and decrees that 'the contract is a contract for the payment of a definite rental of 13% annually, upon the cost of the houses, the land, and improvements, as shown in the record, and that in order to avoid the contract the defendant must show that the inability to rent the houses was due to the method of construction or type of houses, as to which latter the defendant has the burden, and which the Court is of opinion that it has not carried.

"Wherefore, the Court adjudges and decrees that the defendant is not entitled to a cancellation of the contract on account of the method of construction or type of the houses, or for any reasons so far appearing in the record, and that the defendant is bound to pay to the complainant in equal monthly installments a rental of 13% upon the cost of the houses, lands, and improvements, as above indicated, and that the complainant will have and recover of the defendant the sum of $2 673 23, being the difference between the amount of the rentals paid to complainant by the defendant and 13% upon the costs of the properties, up to and including the month of November, 1930. The proof on file only shows the payments made by the defendant to the complainant from and including

the months of October, 1929, to and including the month of November, 1930, October, 1929, being the first month after it attempted to cancel the contract, and the Court is therefore unable to determine the difference between the rentals actually paid and the contract rentals of 13% during a longer period of time, and therefore limits the decree for such differences to the period covered by the proof on file. It appears that by an agreed order heretofore entered in this cause, without prejudice to the rights of either of the parties, the defendant has been collecting the said rentals and deducting 5% therefrom and turning the balance over to the complainant, and it is a matter of calculation to determine the amount of rentals due. According to the statement, Exhibit 'A' to the deposition of defendants' witness Crouch, defendant has paid the complainant for the months of October, 1929, to and including the month of November, 1930, the sum of $2,830.17, whereas the accrued rentals at the rate of 13% for said period amount to $5,503.40.

"It is further ordered, adjudged and decreed that the defendants' cross-bill be and the same is hereby dismissed, and the defendant taxed with the costs of the cause, and for the judgment above rendered and the costs of the cause, execution may issue. On motion of Sells, Simmonds and Bowman, Attorneys, a lien is hereby declared on the recovery herein granted for their reasonable attorneys fees.

"To the action of the Court in all things adverse to its interest, the defendant excepts and prays an appeal to the next term of the Court of Appeals which meets at Knoxville on the second Monday in May, 1931, which appeal is granted upon the execution of bond as required by law, within thirty days from the 12th day of February, 1931. . . ."

Perfecting the appeal that was prayed for and obtained, the defendants have made the following assignments of error:

"Error No. I. The learned Court erred in finding and holding that the contract between complainant and defendant, dated February 25, 1928, when properly construed in the light of the surroundings and circumstances of the parties at the time of its execution, and in the light of the conduct of the parties and the construction placed thereon by them, is a contract by which the defendant bound itself to pay to the complainant for a period of ten years, subject to its right to cancel the contract on account of its inability to rent the houses, due to the method of construction or type of house, rental upon the houses in question of 13% annually of the cost thereof, including land and utilities assessed against the property, payable in equal monthly installments, and in rendering a judgment against the defendant for the sum of $2,673.23, and the costs of the cause, and in dismissing defendant's cross-bill.

"The learned Court should have held that under said contract defendant only bound itself to pay the complainant such rents as

it might receive in renting said houses to its employees, not exceeding 13% annually on the net cost of said houses, including land and utilities assessed against the property if any, for a period of ten years, subject to the right of cancellation in event that it was unable to induce its employees to occupy said houses on the rental basis above refered to, due to the method of construction or type of house, and after so holding it should have sustained said cross-bill and rendered a judgment for the amount overpaid complainant of $1449.14, and the costs of the cause.

"Error No. II. The learned Court erred in holding that the defendant is not entitled to a cancellation of the contract on account of the method of construction or type of house, or for any other reasons appearing in the record, and that its letter of August 31, 1929, filed as Exhibit 'D' to the bill did not effectuate a cancellation of said contract as of October 1, 1929.

"The Court should have held that the defendant was unable to induce its employees to occupy the houses on the rental basis referred to in the contract, due to the method of construction or type of house after due diligence in trying to rent said houses to their employees, and that for this reason it was entitled to cancel said contract, and its said letter of August 31, 1929, did terminate same as of October 1, 1929.

"Error No. III. The Court erred in holding that the complainant did not accept or agree to defendant's cancellation as of October 1, 1929, and that the arrangment between Dr. Brekke and Mr. Switgall made after the letter of cancellation dated August 31, 1929, was made and referred to and confirmed in Dr. Brekke's letter of September 26, 1929, under which defendant was to collect the rents on the present rental basis and retain 5% commission, was a mere temporary expediency to save costs to the parties and to avoid immediate litigation and receivership.

"The Court should have held that such arrangement was a new contract which estopped the complainant to thereafter insist that defendant had no right to cancel said contract, and that its cancellation thereof was effective as of October 1, 1929. . . ."

After an examination of the record, we find ourselves in complete accord with the findings and opinion of the chancellor and believe his disposition of the case has fully covered its merits. We are of opinion that the following clause of the contract: "It (meaning the Glanzstoff Corporation) furthermore assumes liability for the payment of the rent on the first twelve (12) houses for a period of ten years or until otherwise disposed of. This rent to be payable in equal monthly payments and not to exceed annually a total of thirteen per cent on the net cost of said houses, including land and utilities assessed against the property, if any, which total percentages provides three per cent for taxes, insurance and repairs," amounts simply to a

guaranty that the rental on the first twelve houses (it was probably contemplated that the company would build more) would and should realize the owner as much as the maximum therein specified, when they were located on the property and built according to the plans and specifications that were provided for in the contract and which were to be approved by the corporation. Otherwise the rental contract would have possessed very little value to the owners, as pot luck at whatever rental occupant would agree to pay would have been their promise for such an outlay with only a promise of collection by the corporation from such of their employees as might occupy some of the houses. We do not believe that such a situation was contemplated by complainant, especially against an unknown competition that might arise, as it did arise in facilities furnished by others, among them the Watauga Corporation, which it appears was an allied concern of the Glanzstoff, and from which the complainant was required to purchase lots on which to construct the houses; which also were to be sold to the Glanzstoff Corporation upon seasonable requirements and advantageous terms to it. There is much in the record from which it would be authorized to characterize the attempted cancellation of the contract, after houses became plentiful and strikes prevalent, as an opportune afterthought, for there can be no doubt as to how the parties regarded the obligation to observe the guaranty up to the letter which gave notice of the attempted cancellation. From the time of the acceptance of these houses in September, 1928, to the notification of a discontinuance in August, 1929, the obligation to pay the minimum rental thus fixed was recognized and discharged. Pending which, additional agreements increasing the cost were had, as evidenced by the two letters quoted in the first part of this opinion. It is true that it is insisted that the agreements for increase in the cost of the houses could not enlarge the obligation theretofore existing, but we think however much it might be insisted that the guaranty clause above set out was so free from ambiguity as not to be affected by any mistaken practical interpretation which the parties gave it, there is yet a circumstance involved which, if it were necessary to so hold, effected an amendment of the contract, or estopped the Glanzstoff Corporation to insist that the contract does not guaranty the rental as claimed by complainant.

As will be observed, during the time of the practical interpretation of the contract by the parties themselves in which they were paying the rent as upon the thirteen per cent basis, this correspondence arose as to these additions in the shape of improvements. The request for additional expenditures for landscaping and the written reply thereto left no doubt of the interpretation put upon the consequences as it related to the contract. This was followed by letter of May 29th regarding the screening, and while it is true that the letter states that, ''We will pay you on the same terms and conditions as the

houses," it was after the written interpretation of the landscaping letter which followed the practical and in this way agreed interpretation of the contract in the payments that had been made, and therefore, in view of this written and practical interpretation, the expenditures were made which would and should estop the Glanzstoff Corporation from insisting upon any other.

We do not care to elaborate further upon the opinion of the chancellor, which we think is well supported by the proof and is admirably expressed in consonance with the merits of the case and is adopted by us. The assignments are therefore all overruled, and his decree is affirmed. It will be entered here with costs against appellant, including also any further obligation of the bond.

Portrum and Thompson, JJ., concur.